**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

KATHLEEN MARIE KELLY,

                 Plaintiff,

        v.                                No. 3:15-CV-775
                                                (CFH)

CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL
SECURITY,

                 Defendant.

_____
**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

**APPEARANCES:**                         **OF COUNSEL:**

Lachman, Gorton Law Firm        PETER A. GORTON, ESQ.
P.O. Box 89
1500 East Main Street
Endicott, New York 13761-0089
Attorneys for Plaintiff

Social Security Administration     MICHELLE L. CHRIST, ESQ.
Office of Regional General Counsel
Region II
26 Federal Plaza, Rm. 3904
New York, New York 10278
Attorneys for Defendant

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

### MEMORANDUM-DECISION AND ORDER

Plaintiff Kathleen Marie Kelly brings this action pursuant to 42 U.S.C. § 405(g)

seeking review of a decision by the Commissioner of Social Security ("Commissioner"

or "defendant") denying her applications for supplemental security income benefits

("SSI") and disability insurance benefits.  Dkt. No. 1 ("Compl.").  Plaintiff moves for a finding of disability, and the Commissioner cross moves for a judgment on the pleadings.  Dkt. Nos. 15, 18.  Plaintiff filed a reply.  Dkt. No. 21.  For the following reasons, it is recommended that the matter be reversed and remanded to the Commissioner for further proceedings.

## I. Background

Plaintiff, born on May 31, 1969, graduated from high school, where she was in special education classes, and completed one and one half years of college.  T at 42.[1] Plaintiff previously worked as a taxi driver; on an assembly line at a commercial bakery; and as an assistant manager, front desk clerk, and night auditor at a hotel.  Id. at 44-48, 239.  Plaintiff was involved in a car accident in 2008 wherein she suffered a fracture of the right pelvis and acetabulum and a contusion and sprain of her right knee.  Id. at 335, 377, 379.   Plaintiff slipped and fell on ice in January 2011, which resulted in a torn medial meniscus and lead to arthroscopic surgery on her left knee in November 2011. Id. at 335, 390.

Plaintiff protectively[2] filed a Title II application for a period of disability and disability insurance benefits and a Title XVI application for supplemental security

---

[1]  Citations to "T" refer to the pagination in the bottom right-hand corner of the administrative transcript, not the pagination generated by CM/ECF.

[2]  "When used in conjunction with an 'application' for benefits, the term 'protective filing' indicates that a written statement, 'such as a letter,' has been filed with the Social Security Administration, indicating the claimant's intent to file a claim for benefits.  See 20 C.F.R. §§ 404.630, 416.340.  Allen v. Comm'r of Soc. Sec., No. 5:14-CV-1576 (DNH/ATB), 2016 WL 996381, at *1 (N.D.N.Y.  Feb. 22, 2016), report and recommendation adopted sub nom., 2016 WL 1020858 (N.D.N.Y. Mar. 14, 2016).

income on May 30, 2012.  T at 117-190.  Plaintiff alleged a disability onset date of February 24, 2008.  Id. These applications were denied on August 7, 2012.  Id. at 79-97.   Plaintiff requested a hearing before an administrative law judge ("ALJ"), and a hearing was held on September 26, 2013.  Id. at 33-78.  On March 26, 2014, ALJ F. Patrick Flanagan issued his decision concluding that plaintiff was not disabled.  T at 22-28.  Plaintiff's timely request for review by the Appeals Council was denied, making the ALJ's findings the final determination of the Commissioner.  Id. at 1-3, 109.  This action followed.  See Compl.

## II. Discussion

### A.  Standard of Review

In reviewing a final decision of the Commissioner, a district court may not determine de novo whether an individual is disabled.  See 42 U.S.C. §§ 405(g), 1383(c)(3); Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir. 1990).  Rather, the Commissioner's determination will only be reversed if the correct legal standards were not applied, or it was not supported by substantial evidence. Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987);  Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).  Substantial evidence is "more than a mere scintilla," meaning that in the record one can find "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal citations omitted)).   The substantial evidence standard is "a very deferential standard of review

. . . . [This] means once an ALJ finds facts, we can reject [them] only if a reasonable factfinder would *have to conclude* otherwise." Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis in original) (internal quotation marks omitted). Where there is reasonable doubt as to whether the Commissioner applied the proper legal standards, the decision should not be affirmed even though the ultimate conclusion reached is arguably supported by substantial evidence. See Martone v. Apfel, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999) (citing Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987)). However, if the correct legal standards were applied and the ALJ's finding is supported by supported by substantial evidence, such finding must be sustained, "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citation omitted); Venio v. Barnhart, 213 F.3d 578, 586 (2d Cir. 2002).

### B.  Determination of Disability[3]

"Every individual who is under a disability shall be entitled to a disability . . . benefit . . . ." 42 U.S.C. § 423(a)(1).  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous

---

[3]  Although the SSI program has special economic eligibility requirements, the requirements for establishing disability under Title XVI, 42 U.S.C. § 1382c(a)(3)(SSI) and Title II, 42 U.S.C. § 423(d) (Social Security Disability Insurance ("SSDI")), are identical, so that "decisions under these sections are cited interchangeably." Donato v. Sec 'y of Health and Human Services, 721 F.2d 414, 418 n.3 (2d Cir. 1983) (citation omitted).

period of not less than 12 months." Id. § 423(d)(1)(A).  A medically-determinable

impairment is an affliction that is so severe that it renders an individual unable to

continue with his or her previous work or any other employment that may be available

to him or her based upon age, education, and work experience.  Id. § 423(d)(2)(A).

Such an impairment must be supported by "medically acceptable clinical and laboratory

diagnostic techniques."  Id. § 423(d)(3).  Additionally, the severity of the impairment is

"based [upon] objective medical facts, diagnoses or medical opinions inferable from

[the] facts, subjective complaints of pain or disability, and educational background, age,

and work experience."  Ventura v. Barnhart, No. 04-CV-9018 (NRB), 2006 WL 399458,

at *3 (S.D.N.Y. Feb. 21, 2006) (citing Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir.

1983)).

The Second Circuit employs a five-step analysis, based on 20 C.F.R. §

404.1520, to determine whether an individual is entitled to disability benefits:

> First, the [Commissioner] considers whether the claimant is
> currently engaged in substantial gainful activity.
>
> If he [or she] is not, the [Commissioner] next considers
> whether the claimant has a 'severe impairment' which
> significantly limits his [or her] physical or mental ability to do
> basic work activities.
>
> If the claimant suffers such an impairment, the third inquiry is
> whether, based solely on medical evidence, the claimant has
> an impairment which is listed in Appendix 1 of the regulations.
> If the claimant has such an impairment, the [Commissioner]
> will consider him [or her] disabled without considering
> vocational factors such as age, education, and work
> experience; the [Commissioner] presumes that a claimant who
> is afflicted with a 'listed' impairment is unable to perform
> substantial gainful activity.

> Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he [or she] has the residual functional capacity to perform his [or her] past work.
>
> Finally, if the claimant is unable to perform his [or her] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry, 675 F.2d at 467 (spacing added). The plaintiff bears the initial burden of proof to establish each of the first four steps. DeChirico v. Callahan,134 F.3d 1177, 1179-80 (2d Cir. 1998) (citing Berry, 675 F.2d at 467). If the inquiry progresses to the fifth step, the burden shifts to the Commissioner to prove that the plaintiff is still able to engage in gainful employment somewhere. Id. at 1180 (citing Berry, 675 F.2d at 467).

In addition to the five-step sequential analysis, when a claimant alleges a mental impairment, the ALJ is required to engage in a "special technique" or "psychiatric review technique" at steps two and three of the sequential analysis, set forth in 20 C.F.R. §§ 404.1520a(b)-(e), 416.920a(b)-(e), 416.920a(b)-(e); Petrie v. Astrue, 412 F. App'x 401, 403 (2d Cir. 2011); Showers v. Colvin, 13-CV-1147 (GLS/ESH), 2015 WL 1383819, at *4 (N.D.N.Y. Mar. 25, 2015) (citing Kohler v. Astrue, 546 F.3d 260, 265-66 (2d Cir. 2008)). This technique "helps administrative judges determine at Step 2 of the sequential evaluation whether claimants have medically-determinable mental impairments and whether such impairments are severe." Showers, 2015 WL 1383819, at *4. The technique also helps ALJs to determine "whether [impairments] meet or are equivalent in severity to any presumptively disabling mental disorder (a step 3 issue)." Noble v. Comm'r of Soc. Sec., 13-CV-1443 (GLS/ESH), 2015 WL 1383625, at *3 (N.D.N.Y. Mar. 25, 2015). Under this technique, ALJs "must specify the symptoms,

signs, and laboratory findings that substantiate the presence of the impairment(s) and document [those] findings." 20 C.F.R. § 404.1520a(b).

Next, an ALJ is to assess the degree of functional limitation, or the impact the claimant's mental limitations have on her "ability to function independently, appropriately, effectively, and on a sustained basis." Id. § 404.1520a(c). The ALJ must assess the plaintiff's degree of functional limitation in four functional areas: (1) "[a]ctivities of daily living," (2) "social functioning," (3) "concentration, persistence, and pace," and (4) "episodes of decompensation." Id. §§ 404.1520a(c)(3), 416.920a(c)(3). The ALJ must "rate" the functional degree of limitation in each of these four areas as "[n]one, mild, moderate, marked [or] extreme." Id. §§ 404.1520a(c)(4), 416.920a(c)(4). If the ALJ finds the degree of limitation in each of the first three areas to be "mild" or better and identifies no episodes of decompensation, the ALJ "will generally conclude" that the plaintiff's impairment is "not severe." Id. § 404.1520a(d)(1). Where the plaintiff's mental impairment is "severe," the ALJ must "determine if it meets or is equivalent in severity to a listed mental disorder." Id. § 404.1520a(d)(2). "If yes, then the [plaintiff] is 'disabled.'" Petrie, 412 F. App'x at 408 (quoting 20 C.F.R. § 404.1520a(d)(2)).

"In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision." Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 72 (N.D.N.Y. 2005) (citing Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984)). However, a court cannot substitute its interpretation of the administrative record for that of the

7

Commissioner if the record contains substantial support for the ALJ's decision.  See

Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998).  If supported by substantial

evidence, the Commissioner's finding must be sustained "even where substantial

evidence may support the plaintiff's position and despite that the court's independent

analysis of the evidence may differ from the [Commissioner's]."  Rosado v. Sullivan,

805 F. Supp. 147, 153 (S.D.N.Y. 1992).  The Court must afford the Commissioner's

determination considerable deference, and may not substitute "its own judgment for

that of the [Commissioner], even if it might justifiably have reached a different result

upon a de novo review."  Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037,

1041 (2d Cir. 1984).


### C.  ALJ Decision

Applying the five-step disability sequential evaluation, the ALJ determined that

plaintiff met the insured status requirements of the Social Security Act through June 30,

2009 and had not engaged in substantial gainful activity since February 24, 2008, the

alleged onset date.  T at 24.  The ALJ found at step 2 of the sequential evaluation that,

during the period in question, plaintiff had the severe impairments of status post

fracture of the pelvis with traumatic arthritis of the right hip, internal derangement,

osteoarthritis, status post arthroscopy of the left knee, and obesity.  Id. at 24.  At step 3,

the ALJ determined that plaintiff did not have an impairment or combination of

impairments that met or medically equaled the severity of one of the listed impairments

in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Id. at 25.  The ALJ then concluded that

plaintiff retained the residual functional capacity ("RFC") to:

> lift/carry no more than ten pounds on an occasional and frequent basis, stand for two hours out of an eight hour work day, walk for two hours out of an eight hour workday, sit for six hours of an eight hour workday, and can engage in no operation of right-sided foot controls.

Id. At step 4, the ALJ concluded that plaintiff was able to perform her past relevant work as a night auditor. Id. at 27. Considering plaintiff's RFC, age, education, and work experience, together with the Medical-Vocational Guidelines, the ALJ further concluded that there were other jobs existing in the national economy that she is also able to perform. Id. at 27-28. Therefore, the ALJ determined that plaintiff "has not been under a disability, as defined under the Social Security Act, "from February 24, 2008, through the date of this decision." Id. at 28.

## D. Relevant Medical Evidence

### 1. Michael G. McClure, M.D., Orthopedist

Plaintiff began treating with Dr. McClure in March 2008, after a motor vehicle accident wherein she sustained "a fracture of the right pelvis and acetabulum, essentially nondisplaced." T at 378, 400. Dr. McClure indicated in multiple Workers' Compensation evaluations that plaintiff could perform "sedentary work," "desk work," or "a normal job with her knee" and "a modified job with her hip." Id. at 304, 360, 361, 368, 373. Throughout his treatment of plaintiff, Dr. McClure recommended that plaintiff lose weight and engage in an exercise program to strengthen her hip and knee. Id. at 305, 318, 360, 371-72.

Three months after the ALJ's decision was issued, Dr. McClure completed an "impairment questionnaire."[4] T at 400-04. Dr. McClure diagnosed plaintiff with "[a]dvanced osteoarthritis of the Rt hip. Post-traumatic and moderate degenerative arthritis of both knees." Id. at 400. He indicated that "xrays show traumatic arthritis rt. hip, moderate arthritis of both knees." Id. Plaintiff's primary symptoms were right hip pain and bilateral knee pain. Id. at 401. The pain frequency was reported as "constant" and it was indicated that "activity increases pain." Id. Dr. McClure indicated that plaintiff could sit for three hours in an eight-hour work day, and stand and/or walk for less than one hour. Id. at 402. He stated that it was necessary for plaintiff to avoid continuous sitting. Id. She needed to get up from a seated position every thirty minutes and wait thirty minutes before sitting back down. Id. Plaintiff could lift and carry no more than five pounds occasionally. Id. Dr. McClure indicated that plaintiff's pain or symptoms would frequently – "from 1/3 - 2/3 of an 8-hour workday" – interfere with her attention and concentration. Id. at 403. He believed that plaintiff could need to take unscheduled breaks every thirty minutes to an hour, lasting for fifteen to twenty minutes. Id. Dr. McClure opined that plaintiff was likely to miss work more than three times per month. Id. He indicated that plaintiff's "symptoms and limitations as detailed in this questionnaire applied as far back as" February 24, 2008. Id. at 404.

---

[4] The record that was before the ALJ did not contain a full statement of plaintiff's function-by-function limitations from Dr. McClure.

## 2. Dr. Musthaq Sheikh, M.D.

Dr. Sheihk performed an internal medicine examination at the request of the Commissioner on July 26, 2012.  T at 335.  Plaintiff reported experiencing migraine headaches since a 1995 "windshield injury."  Id.  She reported experiencing "5 to 6 episodes a month of the migraine headache which involves the whole head, especially the front with nausea, vomiting, and photosensitivity."  Id. at 335-36.  Plaintiff indicated that "[m]any times the pain is not that severe, at a 5 to 6/10 and dull, but occasionally gets very severe at 10/10 and she has gone to the ER to get narcotic injections.  The migraine headache may last up to a maximum of four days."  Id. at 336.  Plaintiff reported cooking twice a week, doing laundry twice per month "with help from the roommate," shopping twice per month, showering four times per week, and dressing herself daily.  Id. at 337.  She reported reading and watching television.  Id.  Plaintiff indicated that she "needs her cane most of the time if it is more than a few feet walk to steady herself and it helps with the pain in the hip and knee."  Id.

Dr. Sheikh indicated that plaintiff was "in no acute distress" during the examination.  T at 337.  Her gait was "slow and wide based."  Id.  Plaintiff was unable to walk on her heels or toes due to pain.  Id.  Plaintiff's squatting was limited to twenty-five percent.  Id.  Her stance was normal.  Id.  Plaintiff "used a cane to steady herself and for relief of pain."  Id.  Without the cane, plaintiff could "walk only a few steps, but needs the cane to steady herself for further relief of the pain."  Id.  Dr. Sheikh opined that the cane "is medically necessary for relief of pain an in help walking beyond a few steps."  Id.  He concluded, "in my opinion, the cane is medically necessary."  Id.  Plaintiff did not

need help changing for the exam, but needed to use the cane to get on and off the examination table and to rise from her chair.  Id.

On examination, plaintiff had full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally of the cervical spine.  T at 338.  Her lumbar spine showed "limited flexion and extension to 75 degrees, lateral flexion to 15 degrees bilaterally, rotation to 20 degrees bilaterally."  Id.  Plaintiff had tenderness over T6, T8, L2, and L5.  Id.  Plaintiff had positive straight leg raise at forty-five degrees bilaterally supine and sitting.  Id.  She had "limited ROM of hip to 75 degrees flexion and extension bilaterally, exterior rotation to 20 degrees bilaterally, and adduction to 10 degrees bilaterally, abduction to 20 degrees bilaterally."  Id.  Plaintiff's ROM of her right knee was "limited to 130 degrees for flexion and extension and for the left knee it was 110 degrees."  Id.  Plaintiff had "slight tenderness of the left knee, but no swelling.  No evident subluxations, contractures, ankylosis, or thickening."  Id.  Her strength was "5/5 in the upper and lower extremities."  Id. at 339.  She had "[d]ecreased sensation over the right leg, right thigh, calf, and entire right leg."  Id.

Dr. Sheikh's medical source statement provided that plaintiff was "[m]oderately limited in bending" and "[m]arkedly limited in squatting, carrying, lifting, standing, or walking."  T at 339.  Dr. Sheikh's prognosis for plaintiff was "guarded."  Id.

### 3.  Dr. Guardi K. Bhard-Waj, M.D.

Plaintiff's primary care physician is Dr. Bhard-Waj.  The record evidence indicates that plaintiff treated with Dr. Bhard-Waj for dental pain.  T at 397.  There are

no other records from Dr. Bhard-Waj in the record beyond what appears to be general physical examinations.  Id. at 386-89.[5]

## E.  The Parties' Arguments

Plaintiff argues that the ALJ committed reversible error insofar as he: (1) improperly assessed the opinion of plaintiff's treating orthopedist Dr. Michael McClure, (2) failed to "properly assess" plaintiff's morbid obesity, (3) failed to conclude that her migraines were severe, which was compounded his failure to request certain relevant medical records, and (4) failed to account for plaintiff's use of a cane in reaching plaintiff's RFC.  See generally Dkt. No. 15.  Defendant argues that (1) plaintiff misread the ALJ's determination relating to plaintiff's obesity, (2) plaintiff misconstrues the record with regard to obtaining medical records, and (3) properly evaluated all of the medical evidence.  See generally Dkt. No. 18.

## 1.  Migraines and Related Medical Records

Plaintiff vehemently argues that the ALJ erroneously denied her request for additional hospital records relating to her migraines.  Dkt. No. 15 at 17.  She argues that due to the incomplete records relevant to her migraines, the ALJ improperly concluded that her migraines were not a severe impairment.  Id. at 15-16.  The Court finds that the ALJ committed no reversible error in declining to request the hospital records on plaintiff's behalf and properly considered the evidence relevant to her migraines in

---

[5]  These handwritten records are largely illegible.  T at 386-89.

concluding that they were not severe.

At the hearing, plaintiff indicated that she has headaches "quite regularly" where her vision "goes blurry" she "put[s her] glasses on, it corrects [her] vision for a little while, and [her] vision goes blurry again even with [her] glasses." T at 54. Plaintiff indicated that she gets "sick and nauseous" and "ends up either in the bathroom throwing up or in the hospital getting a shot of demerol." Id. at 55. Plaintiff provided that she gets headaches "at least four times a week, and they last for four days. Sometimes . . . they last for two days, for days. Sometimes they can last the whole week." Id. When the ALJ indicated that it "doesn't make any sense" to have a headache four times per week lasting for four days," plaintiff clarified that she "can go three days without a headache" and sometimes when she gets a headache, it lasts two or four days." Id. at 57. She has to lie down in a dark room and take Excedrin, an over-the-counter pain reliever. Id. Plaintiff indicated that she has gone to the emergency room "over 10 times because of migraines." Id. at 54. She further indicated that "lately, [she has] been able to semi-control it with Excedrin, but Excedrin only works for so long," so she needs to keep taking more Excedrin. Id. at 55. She does not take any prescription migraine medication because her primary care provider Dr. Bhard-Waj tells her to continue with Excedrin. Id.

At the hearing, plaintiff indicated that she "cannot afford to pay for the paperwork that he asked from Dr. McClure, and they had asked for that and Dr. Bhard-Waj's paperwork. I can't afford what they want for my records." T at 71. Plaintiff's counsel indicated that it is a "policy of [his] firm not to advance funds to get records." Id. at 72.

14

The ALJ then proceeded to speak with plaintiff and her counsel about plaintiff's various providers, which records he already had, and which he lacked. Id. The ALJ indicated that he had records from Wilson Hospital from September 2011 where plaintiff sought treatment for a headache. T at 73. Plaintiff confirmed that , other than the one September 2011 visit for headache, she had not been back to Wilson Hospital. Id. The ALJ asked whether plaintiff had been to Binghamton General, and plaintiff indicated that she went there for bronchitis and an ankle sprain. Id. The ALJ explicitly asked plaintiff, "you said you've been admitted a lot of time for headaches and I've only got one ER visit for headaches. Where do you generally go when you have headaches and go to the ER?" Id. at 73-74. Plaintiff provided that she went to Lourdes, General, and Wilson "a couple times" each. Id. at 74. The ALJ asked plaintiff "[h]as it been in the last year?", and plaintiff answered "Not yet. No." Id. He also asked whether plaintiff visited hospitals in 2013 for migraines, and plaintiff indicated "No. Not since . . . I've been try [sic], I've been controlling it pretty much with the Excedrin and sleeping." Id. The ALJ asked if she went to any of the three hospitals in 2012 for migraines, and plaintiff said, "[n]o, because I've been trying to – I've been doing my best to control it with the Excedrin or laying down." Id. Plaintiff further provided that she was "mainly trying to deal with my family doctor with the headaches the best I can because, like I said, the hospitals are getting very, they're getting pretty expensive. It's almost like $300, $400 per ER visit" and Medicaid covered only "to a certain point." Id. at 75.

The ALJ told plaintiff's counsel, "unles you can get something more specific – as to specifically what you want, I'm not going to write to – two hospitals." Id. at 74. He

continued, "[b]ut if you can identify something more specific. It sounds like she hasn't been there for her headaches anyway. Sprained ankle and bronchitis . . . that's an acute thing" Id. at 74-75. The ALJ told plaintiff's counsel that he was not going to request the records regarding her sprained ankle and bronchitis. Id. at 75. He indicated that he was going to request records from Orthopaedic Associates and Dr. Bhard-Waj. Id.

Thus, the record demonstrates that, although plaintiff indicated that she visited the emergency room over ten times for headaches, she could not identify any visits from 2012 or 2013. The ALJ indicated to plaintiff's counsel that he would request hospital records if the attorney could identify the specific records he needed, as plaintiff indicated only visiting a hospital for bronchitis and a sprained ankle, which were acute issues not considered in the disability analysis. T at 75. Although plaintiff's lawyer at the hearing indicated that it was his firm's policy not to advance the costs of records for clients, and plaintiff could not afford the costs, plaintiff's attorney did not identify specific records that he wished to request that were relevant to plaintiff's migraines or update the ALJ with this information. Id. at 72, 74-75. Indeed, although plaintiff submitted additional evidence to the Appeals Council, no additional hospital records concerning visits for migraines were provided. Id. at 4-5. Thus, the Court does not have any additional records to review, and it not entirely clear whether there are hospital records relevant visits for migraines from the onset date to the September 2011 visit plaintiff identified. Although it is possible that there may be records from hospital visits in 2011 or earlier, the ALJ explicitly inquired about these records, and advised plaintiff's counsel

16

that he would obtain specific relevant records if they identify that such records exist.  It appears that plaintiff's counsel did not identify these records.

Although an ALJ has a duty to develop the medical record where gaps exist, it is plaintiff's duty to identify which medical records are needed, and although the ALJ asked counsel to identify the records needed and indicated that he would request such relevant records, counsel did not identify these records.  T at 72-75.  The ALJ properly considered the migraines insofar as he considered that plaintiff demonstrated one documented emergency room visit for migraines in 2012 and considered plaintiff's testimony regarding migraines.  Id. at 26 (citing T at 347-54); see generally Shrock v. Shrock, 12-CV-1989 (MAD/CFH), 2014 WL 2779024 (N.D.N.Y. June 19, 2014).

### 2.  Obesity

Plaintiff contends that the ALJ improperly assessed her as having a body mass index ("BMI") of 30, which would indicate that plaintiff is on the lowest level of obesity, but because plaintiff is 5' 8", and weighs 326 pounds, her BMI is 49.6, which indicates extreme obesity.  Dkt. No. 15 at 4, 11-15.  Further, plaintiff argues that the ALJ did not sufficiently consider the impact of plaintiff's obesity on her musculoskeletal impairments.  Id. at 16-17.

Although '[o]besity is not in and of itself a disability; . . . [it] may be considered severe – and thus medically equal to a listed disability – if alone or in combination with another medically determinable . . . impairment(s), it significantly limits an individual's physical or mental ability to do basic work activities.'"  Garcia v. Astrue, 10 F. Supp. 3d

282, 296 (N.D.N.Y. 2012) (quoting <u>Cruz v. Barnhart</u>, No. 04-CV-9011 (GWG), 2006 WL 1228581, at *10 (S.D.N.Y. May 8, 2006). The SSA regulations instruct that the combined impact of obesity and musculoskeletal impairments must be carefully considered at steps two and four because "'obesity is a medically determinable impairment that is often associated with disturbance of the musculoskeletal system . . . The combined effects of obesity with musculoskeletal impairments can be greater than the effect of each . . . considered separately.'"). <u>Id.</u> (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1, 1.00(Q)).

Here, plaintiff misstates the ALJ's decision. As the Commissioner argues, the ALJ did not conclude that plaintiff had a BMI of 30, but that her BMI *exceeded* 30. T at 24-25; Dkt. No. 18 at 8. After reaching his RFC assessment, the ALJ noted that he "fully considered the claimant's obesity in coming to the above finding." <u>Id.</u> at 27. The fact that the ALJ did not set forth plaintiff's exact BMI is of no consequence, as he clearly identified that plaintiff's BMI indicated that she was obese and cited to the medical evidence that listed her BMI. <u>Id.</u> at 24-25 (citing Exh. 3F, 4F); <u>see</u> <u>Pellam v. Astrue</u>, 508 F. App'x 87, 91 (2d Cir. 2013).

As far as considering the impact of plaintiff's obesity on her other limitations, the record supports that plaintiff's orthopedist indicated that plaintiff needed to lose weight, and that she should lose a significant amount of weight in order to be able to undergo a hip replacement surgery. T at 305. Plaintiff reported to the consultative examiner that her weight made it difficult to get around. <u>Id.</u> at 335. Although plaintiff suggests that plaintiff's weight was the sole reason that a hip replacement surgery was deferred, the

records do not indicate that the delay in undergoing the total hip replacement was *solely* due to the doctor's desire to have plaintiff lose weight. In a more recent medical note, Dr. McClure indicated that, "*[e]ventually*, she will probably need a hip replacement on the right side. In the meantime, would recommend she continue the exercise program to strengthen and rehabilitate her hip and knee. Would recommend she avoid hip replacement at this time." Id. at 356; see also id. at 305, 318, 360-61, 370-371 (emphasis added). This suggests that Dr. McClure's deferring the hip replacement was not solely to provide time for plaintiff to lose weight, but because the replacement was not yet needed and because he wanted plaintiff to exercise to strengthen the hip. Id. at 356.

Significantly, no medical provider imposed additional limitations on plaintiff due to her obesity nor indicated that plaintiff's limitations were worsened due to her weight. Dr. McClure's June 2014 assessment does not indicate that obesity was a cause or contributor to her pain. T at 400-04. Instead, he indicates that it is plaintiff's post-traumatic right hip pain and bilateral knee pain that are the cause of her limitations. Id. at 401; see, e.g., Younes v. Colvin, 14-CV-170 (DNH/ESH), 2015 WL 1524417, at *4, *4 n.15 (N.D.N.Y. Apr. 2, 2014) (holding that, where the medical providers did *not* conclude that the plaintiff's obesity contributed to her ability to perform relevant work activities, the ALJ did not err in failing to set forth specific additional limitations in the RFC to account for the plaintiff's weight) (citing Farnham v. Astrue, 832 F. Supp. 2d 243, 261 (W.D.N.Y. 2011); Rockwood v. Astrue, 614 F. Supp. 2d 252, 276 (N.D.N.Y. 2009) (additional citation omitted)). Social Security Ruling 02-1p cautions ALJs to avoid

making any assumptions regarding a claimant's obesity if the medical evidence does not support that the obesity causes or increases the claimant's functional limitations ("We will not make assumptions about the severity of functional effects of obesity combined with other impairments. Obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment. We will evaluate each case based on the information in the case record." ). SSR 02-1p, 2002 WL 34686281, at *6 (S.S.A. Sept. 12, 2002).

Although obesity, in itself, can be considered a disability, the ALJ appropriately considered plaintiff's obesity insofar as he reviewed the limitations opined by plaintiff's physicians and took those opinions into account in rendering his RFC. See generally Younes, 2015 WL 1524417, at *4 (noting that courts have held that "administrative law judges implicitly factor obesity into their decisions when they rely on medical reports that note claimants' obesity and provide overall assessments of work-related limitations.") (citations omitted). The ALJ explicitly indicated that he considered plaintiff's obesity in rendering his opinion. T at 27. Although the ALJ did not discuss in detail the various medical records wherein plaintiff's weight was noted, the ALJ is under no requirement to set forth each relevant record reviewed, especially where it is clear that he considered such records. T at 27; see Pellam, 508 F. App'x at 91. Accordingly, the Court finds that the ALJ appropriately and sufficiently considered plaintiff's obesity in rendering his disability determination, and remand is not necessary on this ground.

\

### 3. Dr. McClure's Medical Assessment

Plaintiff argues that the Appeals Council erred insofar as it denied his request for review after he submitted new evidence from Dr. McClure – a June 2014 statement providing a function-by-function assessment of plaintiff's physical abilities. Dkt. No. 15 at 10. Defendant argues that plaintiff's contention that McClure's June 2014 report "defines what he meant by 'sedentary work' is speculative as Dr. McClure makes no such statement." Dkt. No. 18 at 11. Further, defendant contends that it is unclear whether the June 2014 report was intended to apply to the relevant time period. Id. Plaintiff contends that Dr. McClure's June 2014 report, rather than an attempt to define what he meant by sedentary work, "sets forth the CAPACITY of the Plaintiff." Dkt. No. 21 at 1 (emphasis in original).

The term "sedentary work" is a term of art, which may have different meaning when used in a non-social security disability context, then its generally understood meaning. In a District Court case from North Carolina, the plaintiff argued that the ALJ erred in rejecting a treating physician's conclusion that the plaintiff was limited to sedentary duty. The Court "'sedentary work'' is a term of art, defined by the regulation . . ." Matthewson v. Astrue, 4:08-CV-248-FL, 2008 WL 183278, at *17 (E.D. N.C. Jan. 18. 2008). In fact, the SSA has advised that

> adjudicators must not assume that a medical source using terms such as 'sedentary' and 'light' is aware of our definitions of these terms. The judgment regarding the
extent to which an individual is able to perform exertional ranges of work goes beyond medical judgment regarding what an individual can still do and is a finding that may be dispositive of the issue of disability.

SSR 96-5p, 1996 WL 374183, at *5 (S.S.A. July 2, 1996).  Although Dr. McClure

concluded that plaintiff could perform "sedentary work," as the Commissioner is solely

responsible for determining the individual's RFC, the ALJ is not required to credit such

statement.  In fact, sedentary work, as defined by the SSA regulations,

> involves lifting no more than 10 pounds at a time and
> occasionally lifting or carrying articles like docket files,
> ledgers, and small tools.  Although a sedentary job is defined
> as one which involves sitting, a certain amount of walking
> and standing is often necessary in carrying out job duties.
> Jobs are sedentary if walking and standing are required
> occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

The ALJ gave "controlling weight to Dr. McClure's opinion at Exhibit 8F[6] indicating

that the claimant can perform a sedentary desk job but is unable to drive safely due to

hip pain when she moves her foot to brake."  T at 26.[7]  He further gave "controlling

weight to Dr. McClure's statement that the claimant can do a modified job with her hip."

Id.  However, mere fact that the treating provider indicated that plaintiff could perform

"sedentary work" or a "desk job," does not necessarily mean that the ALJ interpreted this

---

[6]  Exhibit 8F is found at pages 356-82 in the administrative transcript.

[7]  Although not explicitly addressed by the parties, several of the medical records from Dr.
McClure are from plaintiff's workers' compensation claim, and indicate conclusions about whether plaintiff
was "disabled" from work.  The ALJ indicated that he gave "less weight to the various statements
regarding whether the claimant is or is not disabled for Workers' Compensation purposes as these
statements do not outline what the claimant's function by function abilities are."  T at 27.  It is well
established that an ALJ may grant little weight to disability findings that are "formed in a Workers'
Compensation context."  Mortise v. Astrue, 713 F. Supp. 2d 111, 125 (N.D.N.Y.  2010) (citing Rosado v.
Shalala, 868 F. Supp. 471, 473 (E.D.N.Y. 1994).  This is because "the standard which regulate workers'
compensation relief are different from the requirements which govern the award of disability insurance
benefits under the Act.  Accordingly, an opinion rendered for purposes of workers' compensation is not
binding on the Secretary."  Id. (quoting Coria v. Heckler, 750 F. 2d 245, 247 (3d Cir. 1984)).  It does not
appear that the ALJ relied on the disability findings in these Workers' Compensation records, nor does
plaintiff argue as such.  T at 27.

statement as an indication that Dr. McClure concluded that plaintiff could perform all of the functions necessary for sedentary work. 20 C.F.R. § 404.1567(a).

The Court notes that it is well-established that an ALJ cannot rely, alone, on a treating provider's general claims that a claimant can perform a certain level of "work." In Walters v. Astrue, 11-CV-640 (VEB), 2013 WL 598331 (N.D.N.Y. Feb. 15, 2013), the treating physician concluded that the plaintiff "was 'appropriate for a sedentary position and occasional 10 pound lifting restriction,'" but could not return to her prior work. Id. at *5. Plaintiff's treating orthopedic surgeon concluded that plaintiff could perform "light duty work" and that she was "temporarily disabled from her job." Id. By contrast, the consultative examiner concluded that "'sitting in a prolonged manner is uncomfortable' for Plaintiff and 'there may be limitations which are significant in any prolonged sitting, standing, or walking.'" Id. The ALJ "discounted this assessment as inconsistent with the treating physicians' opinions." Id. The Court concluded that the ALJ's discounting of the consultative examiner's opinion was erroneous, as "general references to 'sedentary' or 'light duty' work were not sufficient grounds upon which to discount other evidence, including the opinion of a consultative examiner, indicating limitations inconsistent with the requirements of sedentary work.'" Id. Thus, the Court determined that the ALJ should have "re-contacted the treating physicians and requested clarification of their opinions and requested clarification of their opinions concerning Plaintiff's functional limitations." Id. at *6.

Defendant asserts that it is unclear whether Dr. McClure's June 2014 statement is intended to apply to the time period at issue – the onset date to the date of the

hearing decision.  Dkt. No. 18 at 11.  It would seem incongruous that Dr. McClure, in 2012,[8] would conclude that plaintiff could perform sedentary work or a desk job – reading these words in their plain meaning, rather than their formal meaning in the regulations – and in June 2014, indicate that plaintiff would be unable to sit for more than three hours, would need to avoid continuous sitting, and would need to get up every thirty minutes and would need to wait thirty minutes before returning to a seated position as these limitations would appear inconsistent even with the plain-language meaning of "sedentary work."  T at 402.  However, Dr. McClure did indicate in his June 2014 medical opinion, the "symptoms and limitations as detailed in the questionnaire apply as far back as 02/24/2008," the alleged onset date.  Id. at 404.  Thus, this indication suggests that Dr. McClure's function-by-function assessment applied to the relevant period.

Here, the ALJ indicates that he accorded controlling weight to Dr. McClure's medical reports wherein he concluded that plaintiff could perform sedentary work and desk work.  T at 26.  It appears that the ALJ read Dr. McClure's statements that plaintiff could perform light work or desk work as a determination that plaintiff could perform sedentary work, as set forth in the regulations.  20 C.F.R. § 404.1567(a).  Such a finding may amount to harmless error *if* the ALJ otherwise had substantial evidence to support his conclusion that plaintiff could perform the full range of sedentary work.  Thus, the Court will review the sum of the evidence relied on by the ALJ in concluding that plaintiff could perform the full range of sedentary work.

---

[8] See T at 360-61, 368, 373.

24

The ALJ indicated that, in setting forth the weight he accorded to Dr. McClure's medical records and Dr. Sheikh's consultative report, he reviewed the medical evidence, including "MRIs, X-rays, and presentation during exams," "clinical findings, surgical history, and . . . activities of daily living." T at 26-27. The ALJ accorded "some weight" to Dr. Sheikh's "finding that the claimant has moderate to marked[9] physical limitations" as the findings were "consistent with Dr. McClure's above discussed opinion as well as the claimant's clinical findings, surgical history, and above discussed activities of daily living." Id. at 26-27. However, Dr. Sheikh's findings of marked limitation in plaintiff's abilities to walk, stand, sit, lift, and carry cannot be said to be consistent with the ALJ's reading of Dr. McClure's opinion – that plaintiff could perform sedentary work. Id. at 338. As indicated above, the full-range of sedentary work requires sitting for six hours, standing or walking for two, and carrying up to ten pounds – all which, if Dr. Sheikh's findings were given weight, are functions that plaintiff is unable to perform. 20 C.F.R. § 404.1567(a).

If the ALJ implicitly rejected this portion of Dr. Sheikh's consultative report, as it appears he must by the nature of his RFC, then the record was then without any function-by-function assessment. This Court has held previously that a failure to provide such function-by-function assessment may amount to reversible error. See Knighton v. Astrue, 861 F. Supp. 2d 59, 65 (N.D.N.Y. 2012). Although this holding has not been consistently applied throughout this District or within this Circuit, its application is

---

[9] A limitation is considered "marked" when the impairment "interferes seriously with [the claimant's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i).

warranted in the matter at hand where there is medical evidence that plaintiff could not perform the full duties of sedentary work.  Id. (noting that "[t]he courts are divided as to whether the failure to provide a function-by-function analysis is per se grounds for remand or whether it may constitute harmless error[,]" and concluding "[i]n the instant case, remanded is warranted under either standard because in failing to provide a function-by-function assessment, the ALJ appears to have overlooked at least one significant limitation.") (citing cases).  The failure to provide a function-by-function assessment is needed here, where there is evidence that plaintiff could not perform all of the functions required in the opined RFC.  What is troubling, however, "the ALJ did not perform a function-by-function assessment of Plaintiff's ability to perform all of the exertional requirements of sedentary work, or more specifically, he failed to determine Plaintiff's ability to sit, stand, walk, lift, and carry." Sierra v. Astrue, 1:11-CV-88 (RFT), 2012 WL 4490957, at *4 (N.D.N.Y. Sept. 28, 2012).

Even if the Court found that the ALJ committed no error in interpreting Dr. McClure's workers' compensation reports to mean that plaintiff was capable of performing the full range of sedentary work, the Court finds that the Appeals Council committed reversible error insofar as it declined to review the ALJ's decision because Dr. McClure's June 2014 report indicated that plaintiff was incapable of performing the full range of sedentary work, which plaintiff submitted to the Appeals Council as new and material evidence.  This is especially significant because the ALJ accorded controlling weight to Dr. McClure's workers' compensation records.  T at 26.  "[N]ew evidence submitted to the Appeals Council following the ALJ's decision becomes part of the

administrative record for judicial review when the Appeals Council denies review of the ALJ's decision." Perez v. Chater, 77 F.3d 41, 45 (2d Cir.1996). "The only limitations stated in [20 C.F.R. §§ 404.970(b) and 416.1470(b)] are that the evidence must be new and material and that it must relate to the period on or before the ALJ's decision." Id.

Dr. McClure indicated in his June 2014 statement provided to the Appeals Council that plaintiff could sit for three hours, and stand/walk for less than one hour in an eight hour work day; must avoid continuous sitting; must get up from sitting every thirty minutes and wait thirty minutes before returning to a seated position; may lift or carry no more than five pounds, occasionally; would frequently have symptoms of pain severe enough to interfere with attention and concentration; and would need unscheduled breaks every thirty minutes to one hour for fifteen to twenty minutes periods. T at 402-03. This finding is fairly consistent with consultative examiner Dr. Sheikh's findings that plaintiff had marked limitations in squatting, carrying, lifting, standing, and walking. but incompatible with the ALJ's conclusion that plaintiff could perform the full range of sedentary work. Id. at 339.

Thus, the new evidence before the Appeals Council contradicted the ALJ's determination that plaintiff could perform the requirements of sedentary work. The new evidence was from a treating physician, the same physician to whose medical reports the ALJ accorded controlling weight. Dr. McClure's June 2014 questionnaire, as it is a report from a treating physician, is generally entitled to controlling weight; if accorded controlling weight likely dispositive on the issue of disability; and appears largely uncontroverted by any other medical opinion in the record. See Lesterhuis v. Colvin,

805 F.3d 83, 88 (2d Cir. 2015). The Court recognizes that the Commissioner, on remand, ma conclude that Dr. McClure's June 2014 opinion is not entitled to controlling weight, "but that determination should be made by the agency in the first instance, and we should refrain from 'affirm[ing] an administrative action on grounds different from those considered by the agency.'" Id. (quoting Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008)). Dr. McClure's June 2014 opinion set forth limitations which, if given controlling weight, would appear dispositive of the issue of disability as Dr. McClure determined that plaintiff could not stand or walk for longer than one hour, could sit for only three hours, needed a sit/stand option, would need to alternate positions every thirty minutes and would need to avoid returning to a seated position for thirty minutes, could lift and carry only five pounds, would need unscheduled breaks every thirty minutes to an hour for fifteen to twenty minutes at a time, and would be likely to miss more than three days of work per month. T at 400-04; see Lesterhuis, 805 F.3d at 88-89. As Dr. McClure's June 2014 findings, which he indicated applied as far back as February 24, 2008, are clearly inconsistent with the ability to perform sedentary work, and these findings came from the same treating provider that the ALJ relied upon in reaching his conclusion that plaintiff could perform controlling work, the Appeals Council's failure to analyze this opinion is reversible error. T at 404.

Thus, the Appeals Council should have assessed the new medical evidence, and considered the impact of those limitations on the ALJ's conclusion that plaintiff could perform the full range of sedentary work. On remand, the Commissioner is to consider the impact of Dr. McClure's June 2014 assessment on the ALJ's conclusion that plaintiff

28

could perform the full range of sedentary work.

### 4. Plaintiff's Use of Cane

Plaintiff argues that the ALJ "made no provision for Plaintiff's unquestioned need to use a cane" when assessing her RFC.  T at 18.  Defendant argues that plaintiff "does not explain why such a restrictive RFC would not accommodate her need to use a cane."  Dkt. No. 18 at 13.  Further, defendants contend that Social Security Ruling 96-9p addresses requiring a cane for balance, and "[t]here is no evidence that Plaintiff needed the cane to balance; no doctor even opined that she did."  Id. at 14.

The ALJ concluded that plaintiff did not satisfy section 1.02 of the Listings because she did not demonstrate "that she has an inability to ambulate effective, as defined in 1.00B2b.  Treatment records show that claimant wants with a slow, usually limping gait and uses a cane."  T at 25 (citing Exh. 2F, 4F, 8F).[10]  The ALJ noted that plaintiff reported that "she is able to cook, clean, do laundry, grocery shop, go to the mall, attend church, and swim."  Id.  Consultative examiner Dr. Sheikh concluded that plaintiff's cane was medically necessary "for relief of pain and help in walking beyond few steps."  Id. at 337.  Further, Dr. Sheikh observed that "[w]ithout the cane she could walk only a few steps, but needs the cane to steady herself for further relief of the pain."  Id.  Additionally, he observed that plaintiff "needed help from the cane to get on and off of the examination table.  Able to rise from chair without difficulty, but with the help of a

---

[10]  Exhibit 2F and 8F are treatment records from Dr. Michael McClure, M.D.  T at 304-320, 356-82.  Exhibit 4F is the consultative examination report by Dr. Musthaq Sheikh, M.D.  Id. at 335-40.

cane."  Id.

Plaintiff points to Social Security Ruling 96-9p which indicates that "it may be especially useful to consult a vocational resource in order to make a judgment regarding the individual's ability to make an adjustment to other work" if it is determined that the individual "must use such a device[11] for balance because of significant involvement of both lower extremities" as "the occupational base" for such an individual "may be significantly eroded."  SSR 96-9p, 1997 WL 374185, at *7 (S.S.R. July 2, 1996).[12]

There is sufficient medical evidence that plaintiff needed the cane to balance, in addition to assisting her in ambulating.  Although Dr. Sheikh may not have explicitly concluded that plaintiff needed the cane to balance, he indicated such need when he indicated that he observed that plaintiff "needed the cane to steady herself," to get on and off of the examination table, and to rise from her chair.  T at 337.  Thus, the Court is satisfied that the medical record supports that plaintiff needed the cane to balance.  This Court has repeatedly held that the failure to address a plaintiff's use of a cane in assessing his RFC is reversible error.  See, e.g., Allen v. Commissioner of Soc. Sec., 5:15-CV-1557 (DNH/ATB), 2016 WL 996381(N.D.N.Y. Feb. 22, 2016); Gordon v. Colvin,

---

[11]  A cane is a hand-held device.  20 C.F.R. Pt. 404, Subpart P, App. 1 § 1.00(J)(4).

[12]  Plaintiff also cites to listing 1.00, 20 C.F.R. 404, Subpart P which indicates that, where a claimant uses a cane, "examination should be with and without the use of the assisted device unless contradicted by the medical judgment of a physician who has treated or examined the individual" as ambulation both with and without the device "provides information as to whether, or the extent to which, the individual is able to ambulate without assistance."  Plaintiff's reference to 20 C.F.R. § 404 appears misplaced, as the consultative examiner did test plaintiff's ambulation both with and without her cane.  T at 337.  Further, despite citing this listing, plaintiff does not contend that the consultative examiner failed to test her ability to ambulate both with and without her cane.

1:14-CV-541 (GTS), 2015 WL 4041729 (N.D.N.Y. July 1, 2015), Hoke v. Colvin, 1:14-CV-663 (GTS/CFH), 2015 WL 3901807 (N.D.N.Y. June 25, 2015); Canabush v. Commissioner of Soc. Sec., 1:13-CV-429 (FJS/CFH), 2015 WL 1609721, at *5 (N.D.N.Y. Apr. 10, 2015); Stanley v. Colvin, 6:12-CV-1899 (GTS), 2014 WL 1311963, at *8 (N.D.N.Y. Mar. 31, 2014); cf. Johnson v. Barnhart, 312 F. Supp. 2d 415, 428 (W.D.N.Y. 2003) (noting that where the consultative examiner concluded that the plaintiff needed a cane for balance, and the treating physician indicated that the plaintiff was moderately limited in walking, the ALJ's rejection of the consultative examiner's conclusion that the plaintiff needed a cane without first obtaining clarification was an error of law).  Furthermore, the requirement of a cane can significantly erode the number of available jobs as it may impact the ability to perform the full range of work.  See, e.g., Simmons v. Colvin, 13 Civ. 1724 (KBF), 2014 WL 104811 (S.D.N.Y. Jan. 8, 2014). Thus, the ALJ should have considered the impact of plaintiff's need for a cane on her RFC as well as the impact it may have on the number of jobs available to plaintiff in the national economy.

As the Court finds that the matter must be remanded for consideration of a function-by-function assessment of plaintiff, plaintiff's medically-necessitated use of a cane must be assessed in determining (1) the impact of plaintiff's need for a cane to ambulate more than a few steps and to balance impacts her RFC, and (2) whether plaintiff's use of the cane significantly erodes the number of available jobs that plaintiff could perform.  If determined necessary, testimony from a vocational expert should be sought in making the latter assessment.

### III. Conclusion

Having reviewed the administrative transcript and the ALJ's findings, and for the reasons stated herein, the undersigned concludes that the Commissioner's determination is not supported by substantial evidence and that remand for further administrative action consistent with this Memorandum-Decision and Order is needed. Accordingly, it is hereby:

**ORDERED**, that plaintiff's motion for judgment on the pleadings (Dkt. No. 15) is

**GRANTED** and that the matter is remanded to the Commissioner for additional proceedings pursuant to sentence four of 42 U.S.C. 405(g) for further proceedings consistent with this Memorandum-Decision and Order; and it is further

**ORDERED**, that the Commissioner's cross motion for judgment on the pleadings (Dkt. No. 18) is **DENIED**; and it is

**ORDERED**, that the Clerk of the Court serve copies of the Memorandum-Decision and Order on the parties in accordance with the Court's Local Rules.

**IT IS SO ORDERED.**

Dated: September 26, 2016
      Albany, New York

Christian F. Hummel
U.S. Magistrate Judge